Clerk, please call the next case. 209-1928 Richard Liesik v. Weir Construction Good morning. My name is Randy Teradish and I'm here representing the petitioner. The petitioner alleges that the decision of the commission should be reversed for the reason that the factual conclusions based on the evidence the commission made that petitioner was riding a motorcycle and petitioner said he wasn't riding a motorcycle are not supported by the evidence, and further, that the opinions adopted by the commission of Respondent Dr. Zellbe are illogical and without sufficient basis. The decision states on March 9, 2005, petitioner was seen riding a motorcycle and petitioner testified since the date of the accident he was unable to ride a motorcycle. The only evidence of motorcycle riding is a DVD video entered into evidence. At about the 3 minute 42 second mark on the second disc, it shows an unidentifiable motorcycle rider from the rear riding in traffic. The gender of the rider is not visible. The make and model of the motorcycle is not visible. The identity of the rider is not visible. The license plate number is not visible. Counsel, I'm curious as to your opening conclusion that the video surveillance of the alleged motorcycle riding incident was a critical part of this case. There's no reference to the video surveillance in the conclusions of law set forth in the arbitrator's decision. The commission affirmed and adapted the arbitrator's decision, but it also failed to make any reference to the video surveillance. What can you point to that says that that was a critical part of the decision? Where is this coming from? Well, I believe there is evidence that petitioner was riding a motorcycle. You're saying that this was something that was relied on heavily by the arbitrator and the commission, but where in the record does it support that conclusion? Well, I believe it's inferred from the record, and it's stated in Respondent's brief clearly. Respondent says, based on the surveillance, in his brief on page 13, based on the surveillance, appellant's testimony in the history given to the Zelvi, the Respondent's expert, that the appellant is not a credible witness. Well, that's their argument. It doesn't mean that the arbitrator or commission hung their head on it. Also, what about the fact that Zelvi, according to the record here, compared the June 2004 MRIs with the MRI taken in April 1999? He says there's no change. He says the claimant's current condition stemmed completely from underlying degenerative conditions, which had nothing to do with the May 26, 2004 work injury. So can't the commission believe that? Well, I'm going to address that. That's the next part of my argument. So if I could continue, I will address that. But before I continue, I would like to just go over the colloquy that it was decided the petitioner was riding a motorcycle. I will continue. I'd like to talk about the opinions of Dr. Zelvi, and if you would allow me briefly to go over the medical treatment the petitioner had. The petitioner saw Dr. Fahey in April of 1999. Now, this was five years before the accident. He saw Dr. Fahey twice. Dr. Fahey referred him for an MRI, injections, and he never returned to Dr. Fahey. Dr. Fahey states in his chart note, this is the last time he saw him, the next step is to consider epidural block. If he does not respond, then he will return to consider surgical referral. He never returned. Until June 1, after this accident, he saw Dr. Fahey again, referred him for another MRI, and then to Dr. Popillo. The history taken by Dr. Fahey is, he reports a history of similar left sciatica four to five years ago, although he has actually done very well since that time until this recent injury. About six days later, he sees Dr. Popillo, who writes, the patient's history of intermittent left sciatica began back around 1999. He was treated with lumbar epidural steroid injections. He has been relatively pain-free for the last several years until this work-related injury aggravated his symptoms. So both doctors agree that the degenerative changes on the 2004 MRI are not the result of a fall. So in answer to your question, the two MRIs, the one from 1999 and 2004, are very similar. In fact, I think both doctors agree there are really no substantial differences. So then how does that help your claim? I'm getting there. Okay. I am curious. You have my attention. I'm getting there. Now, Dr. Popillo testified in his deposition, my diagnostic impression was lumbar radiculopathy, most likely at L5, aggravated by a work-related injury due to lateral recess stenosis at L4 or 5 on the left. He has degenerative disc disease with resultant stenosis at L4 or 5. So the nerve is exiting through a tight space. You put an axial load on the spine where you have some type of a movement where the space becomes even more constricted, almost as if it's being hit with a hammer. Since the nerve has very little reserve, since there's no room, the nerve takes up some of the force of the axial load. There is an inflammatory response. The inflammation leads to the onset of pain, which we record as sciatica. This pain is due to an aggravation of a clinical syndrome, which we call lumbar disc syndrome, which had been quiescent for at least three years, but now has been aggravated into recurrence because of an injury. And the pain or symptom in this case has not been temporary. It is persistent. And sure, there is a preexisting condition, but the symptoms were not preexisting. They had been quiescent. So his current symptoms, even though in the setting of a preexisting anatomical condition, the current symptoms are a direct and proximate result of the fall, which aggravated the sciatica. Now, these are Dr. Zellbe's opinions. He writes in his first report in September of 2004, his current complaints stem exclusively from the underlying degenerative condition. Based on his prior history and the comparison of the two MRIs, this degenerative condition was not accelerated beyond its normal progression by his work injury. His work injury represented a temporary exacerbation of a preexisting condition. This type of condition returns to its baseline within three to four months. The patient's current symptoms, in any consideration for surgery, which Dr. Papilla referred him for surgery, are exclusively related to his degenerative condition and are unrelated to any temporary exacerbation caused by his work injury. His prior history of back problems and intermittent flare-ups prior to his work injury demonstrate the cause for his symptoms. I'd like to begin by saying only Dr. Zellbe took a history of intermittent flare-ups. He said in this report in September of 2004 that the patient reported annual flare-ups. The treating doctor, both treating doctors took a completely opposite history. Furthermore, Petitioner testified at trial that he did well after the injections in 1999. To answer your question, Dr. Papilla clearly states a mechanical and medical basis for his opinion that the Petitioner's condition was aggravated. Dr. Zellbe, on the other hand, treats Petitioner as a special case. In response to Dr. Zellbe's opinions, Dr. Papilla wrote and actually said in his deposition, some patients return to baseline, others do not. In this patient, it did not happen. Dr. Papilla does not explain why this patient did not return to baseline. It's just his opinion out in space without a basis. Dr. Papilla, if one accepts Dr. Papilla's opinion, then the defect in the logic of accepting that is that one must believe that an MRI must show pathology caused by acute trauma or there can be no aggravation. There's no medical literature to support that. And Dr. Zellbe does not point to any specific part of the anatomy in his back that is continuing to cause his problems. It is just Dr. Zellbe's bare opinion. Well, as I understand the record, Zellbe actually compared the 99 MRI with the later 2004 MRI. Papilla did not. And that's one of the reasons the arbitrator believed Zellbe and not Papilla, because Papilla admittedly did not compare the two MRIs, correct? I don't think it's relevant for the reason that the two MRIs are substantially the same. And the That's not relevant? Well, the current MRI only shows a degenerative condition. Both doctors agree there's nothing on that MRI that was caused from the fall. And if both MRIs show nothing that was caused by the fall, they actually give the same information. There's no new information to be gleaned by Dr. Papilla to look at that 1999 MRI that was taken five years before. And how does that help your client? It's really a neutral point. It doesn't help or hurt my client. Right. It really doesn't make it. It's a red herring. Dr. Papilla agrees. There's nothing in the current MRI that shows any pathology caused by the fall. It was all, everything in the MRI took a long time to get there. It's spondylosis, degenerative arthritis, a degenerative condition. They both agree. They both agree that both MRIs show that. The difference is Dr. Zelbe makes a leap of faith without any basis, saying because there's no change in the MRIs, that they only show a degenerative condition, therefore there can be no permanent injury. He doesn't explain why is this person, why is this petitioner, continuing to have complaints. Whose burden is it to prove the claim? Is it the employer's burden to disprove it or is it the claimant's burden to prove it? The claimant's. So I guess in some way, tell us, this is a manifest way to the evidence case, tell us why the commission's opposite conclusion from the one reached by the commission is clearly apparent. Why is that the case? As I said, Dr. Zelbe's opinion is an opinion with an illogical and defective conclusion. Dr. Zelbe doesn't explain why this person, this particular person, should return to baseline. Why his symptoms are not permanent. He just says they are because he says they are. He doesn't offer a basis to support his opinion. If one accepts his opinion, one has to accept the opinion that every single MRI of every person who has degenerative spine disease must show either a herniated disc or some other pathology relating to an acute episode before a condition can be permanent. There's nothing in the medical literature to support that. So to accept your argument, the medical evidence is neutral, which I think based on Zelbe's opinion would be a higher hurdle to accept. But even assuming that, what if the commission then just doesn't believe your client's testimony as to subjective complaints? Can't they do that? Yeah, but there's nothing in the record that suggests that's so. The only thing in the record that would suggest they didn't believe the Petitioner is that he was riding a motorcycle, seen riding a motorcycle. And I believe that is in the decision. But it isn't a decision? That that was part of their finding against him that he was riding a motorcycle? Oh, yeah, absolutely. I believe it's in the decision. Can you point that out to us, where they rely on that? May I? Sure. Page 6, page 16. Approximately two hours of video surveillance was taken of the Petitioner on March 26, 05, and 28 and 29. On March 28, the Petitioner was seen entering a bike shop and was able to balance himself on a bike while being pushed. On March 29, the Petitioner was seen riding a motorcycle. The Petitioner testified that since the date of the accident, he was unable to ride a motorcycle. That's what the Petitioner testified to. Where does it say that they reached a conclusion that was part of the reason they found against him was he was riding a motorcycle? Well, the Petitioner didn't testify to that. He didn't testify that he was riding a motorcycle. It says the Petitioner testified he was unable to ride a motorcycle. He didn't testify to that at all. So, I'd like to read you the three questions that were used as the basis for this conclusion. The Petitioner testified that since the date of the accident, he was unable to ride a motorcycle. These are the questions. And this was on cross-examination. Do you ride a motorcycle? Yes. Are you still able to ride a motorcycle after your 2004 work accident? Not anymore. I can't ride. And why can't you ride? Because it's painful to sit on it. So, the first question was, do you ride a motorcycle? Yes. The second question was, are you still able to ride a motorcycle after your 2004 work accident? Answer, not anymore. I can't ride. Are you still able to ride? Asks, are you riding presently? It's in the present tense. The question was never asked, have you ridden a motorcycle since your accident? And I believe that that conclusion influenced both the arbitrator and the commission. And it's unfair. And it's against the manifest way of the evidence. We'll have time on rebuttal, counsel. That's time? We'll have time on rebuttal. Thank you so much. May it please the court, counsel. My name is Peter Stavropoulos. I represent Word Construction in this matter. We are here on a very narrow issue of causation and whether the commission's decision on the issue of causation is against the manifest way of the evidence. In response to, I don't want to get too much into this motorcycle riding thing. While it is in the statement of facts of the arbitrator's decision, it is not mentioned anywhere in the conclusions of law. It doesn't appear from the record that it played a significant part in the decision of the arbitrator. What did play a significant part in the- The arbitrator must have made a finding that he was seen riding a motorcycle on the date in question, though. With it being in the- Under findings of fact, the arbitrator says the petitioner was riding a motorcycle on March 29th. Correct. So there is a finding of fact, but I think counsel is arguing that that should not be used by the arbitrator in reaching the conclusion of law. And the record really doesn't show that that was a significant part, although he did make the finding that the petitioner was riding a motorcycle in that video. What do you infer, then? Does that go to credibility of the claimant? You know, it's hard to say. I thought it did. In terms of what the arbitrator thought, due to the fact that he didn't cite it in his conclusions of law as a reason why he found against the petitioner, I don't know what factor it played in his thinking. So what does the credibility issue of the claimant go to here? I mean, is there evidence supporting this decision if you, for example, just assume the plaintiff isn't credible? If we assume the plaintiff is not credible, did you say? Yeah. If we assume he's not credible, then I think that goes to the whole issue of whether he was symptom-free between 1999 and 2004. He reported to Dr. Zellbe the first time he saw him that he had annual flare-ups between 1999 and 2004. He testified that wasn't true. Counsel said that the histories taken by the treating physicians were exactly opposite. I would disagree with that. Dr. Popillo, in the history that was even read to this court by my opponent, said he had been relatively pain-free since 1999. So it's not an opposite. He didn't say, oh, I've been fine since 1999 or I've had no issues. He's been relatively pain-free. And that was a big basis of Dr. Popillo's causation opinions was that he was under the impression that the claimant had been asymptomatic since 1999 and now he is symptomatic after 2004 when the record shows that that is not the case. He did have flare-ups. He reported to Dr. Popillo that he had been relatively pain-free. And really, as pointed out by Your Honor, the MRIs of 99 and 04, and then again I think the one in 06 is extremely important as well. When we have cases, as you know from hearing all of these things, where you see a permanent aggravation of the degenerative condition, it accelerates the progression of the disease and it accelerates the degeneration. So between 99 and 04, there's no acute trauma. There's no finding on the MRI that could have been caused by any trauma. In fact, Dr. Popillo says it's just the natural degeneration. It's the force of gravity. And Popillo was his expert. Yes, exactly. And then if you look at 06, that's the same as the 04 and the 99. So where is the aggravation that is resulting in a progression of these symptoms or in a traumatic injury? It's just not there on the objective findings. And to further answer your question, his credibility comes into play when it comes to his reporting of the symptoms. You know, we're going based on his word, if you want to believe him, that he's been pain-free from 99 to 04, and now he continues to have pain, when the objective evidence shows the opposite. Also, his pain complaints, as pointed out by Dr. Zellbee in his third report, don't really match the degenerative findings on the MRI. So even what he's complaining about doesn't match what the objective findings are. It's our position that, from a manifest weight standpoint, counsel has failed to undermine Dr. Zellbee's opinion. The commission was correct and certainly justified in relying on Dr. Zellbee's opinion. To support his opinions, we have the MRIs that we've talked about. We have the fact that he was symptom-free between 19 ñ that he was not symptom-free, pardon me, between 1999 and 2004. That he had a surgical recommendation in 99, showing the severity of the 1999 incident. And that the pain complaints from 1999 to 04 were very similar. They went down the same leg. They were extremely similar findings and symptoms. Contrarily, Dr. Papilla's opinions are not well-founded. In fact, at one point he said the only way he'd be able to tell if the changes on an MRI were caused by an accident would be if he had an MRI one hour before the accident and then an MRI one hour after the accident. That is on page 258 of the record. He also testified the findings on the MRI were chronic and not traumatic. Did Papilla ever compare the MRIs? He never did. He never saw the 1999, and so he never had the opportunity to compare it. There's also no evidence in the record that he saw the 06 MRI and compared that to the 04. And just in response to some things that counsel said, he argued that the rider of the motorcycle was not identifiable, as pointed out by your Honor. The arbitrator found that it was him riding the motorcycle. So it's clear because it's in his findings of fact. And I brought up the whole issue of the motorcycle riding because it's my response brief, and he argued it to a great deal in his brief. So he said, well, I pointed it out. Well, yeah, I was pointing it out because he brought it up. He admits that the degenerative changes on the MRI were not caused by the fall. They're not related to the fall. And with regard to his argument that Dr. Zolby doesn't tell the commission what is causing the pain, that's not the respondent's burden. That would be us proving a case that something else was causing it, and that's not what we have to do on our side of the fence. What Dr. Zolby does do very effectively is point out why there was a temporary aggravation and not a permanent aggravation. And in this case, you know, he's entitled to his compensation while the temporary aggravation is occurring. We paid the TTD, and the TTD for that period was awarded, and we paid the medical while this temporary aggravation was happening. He'd had another flare-up, and it was caused by this fall at work. We're not saying he didn't fall at work. We're not saying he's not entitled to anything. We paid him during the temporary aggravation, and that's sufficient. So the respondent asks that this Court affirm in its entirety the Workers' Compensation Commission's decision based on the opinions of Dr. Zolby. The MRI findings, the testimony of Dr. Papillo regarding the nature of the condition, as well as the causation opinions, and the questionable veracity of Mr. Lisak. Thank you. Thank you, counsel. Mr. Bell? In his April 5th report, Dr. Papillo writes in response to Dr. Zolby's opinions. First of all, Dr. Zolby fails to mention the clinical significance of the symptom-free between 1999 and the current episode. So Dr. Papillo believed that the petitioner was symptom-free until the 2004 episode. Secondly, he fails to mention the clinical significance of the contemporaneous onset of injury and current symptoms. Again, I would like to point out that it's a red herring to suggest that Dr. Papillo is in error, or his opinion is somehow not credible, because he did not see the 1999 MRI. They're the same. The 2004 MRI shows no pathology caused by the accident. So reviewing the other prior MRI isn't going to reveal any other information. I'd also like to point out that the argument was made that there was a surgical referral in 1999. There was not. All there was, all the doctors said, there was Dr. Fay. He says, if the shots, the injections don't help, then we will consider a surgical referral out to another doctor. It's not a referral for surgery. Thank you. Thank you, counsel. The court will take the matter under advisory for disposition.